UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -  X

UNITED STATES OF AMERICA          :     **SEALED INDICTMENT**

    - v. -                          :     

LEONARD MARCHETTA,                :
WILLIAM TAGLIAFERRO, and
GREGORY ZACCAGNINO,               :     

           Defendants.     :

- - - - - - - - - - - - - - -  x

COUNT ONE
(Conspiracy to Distribute Narcotics)

The Grand Jury charges:

**Background**

1.    Oxycodone, a highly addictive, narcotic-strength opioid is used to treat severe and chronic pain conditions, such as post-operative pain, severe back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses.  Oxycodone can be legitimately obtained from most pharmacies with a prescription written by a treating physician, and is typically dispensed in 5 to 30 milligram tablets to patients.

2.    Almost seven million Americans abuse controlled-substance prescription medications, including opioid painkillers, resulting in more deaths from prescription drug overdoses than auto accidents.  Because opioid painkillers are some of the most addictive and potentially dangerous

prescription medications available, their distribution is heavily regulated.  For example, prescriptions for oxycodone cannot exceed a 30-day supply, and cannot allow for "refills." Instead, a patient who has exhausted his or her initial prescription must see his or her doctor again each month and be re-evaluated before obtaining a new prescription from the doctor.

3.   Oxycodone prescriptions have enormous cash value to drug dealers.  Oxycodone prescriptions can be filled at virtually any pharmacy and the oxycodone tablets can then be resold on the street for thousands of dollars.  For example, thirty milligram oxycodone tablets have a street value of $20 to $30 per tablet in New York City, and a value as high as $40 per tablet in other parts of the country, such as Massachusetts, Vermont, and Maine.  In other words, a single prescription for 180 30-milligram tablets of oxycodone can net the distributor as much as $7,200 in cash.

## RELEVANT PERSONS AND ENTITIES

4.   LEONARD MARCHETTA, the defendant, is a physician's assistant who resides and works on Staten Island, New York.  As a physician's assistant, MARCHETTA, under the supervision of a physician or surgeon, is able to diagnose and treat illnesses and prescribe medications, among other

responsibilities. At all relevant times, MARCHETTA has been employed by a medical clinic (the "Clinic"), which advertises itself to the public as a Staten Island-based family medical clinic. At all relevant times, MARCHETTA oversaw the Clinic's day-to-day operations.

5.   LEONARD MARCHETTA, the defendant, ranks third among all physicians and physician's assistants on Staten Island, New York, in the total number of oxycodone tablets he has prescribed from in or about August 2012 through in or about August 2014. During that period, MARCHETTA wrote approximately 4,109 oxycodone prescriptions, averaging approximately 30 prescriptions per week, resulting in more than approximately 611,000 oxycodone tablets in total.

6.   In exchange for cash, LEONARD MARCHETTA, the defendant, wrote medically unnecessary prescriptions for large quantities of oxycodone. MARCHETTA's fee for his participation in the scheme was typically approximately $250 in cash for "doctor visits" that usually lasted just a minute or two, involved no actual physical examination, and consistently resulted in the issuance of a prescription for large doses of oxycodone, typically 150 30-milligram tablets. MARCHETTA also received a separate fee of approximately $500 in cash for each medically unnecessary oxycodone prescription he issued.

3

7.   LEONARD MARCHETTA, the defendant, prescribed oxycodone to "patients" who had no medical need for oxycodone and no legitimate medical record documenting an ailment for which oxycodone would be prescribed.  On a number of occasions, MARCHETTA issued prescriptions in the names of fictitious individuals or individuals whom MARCHETTA never saw.

8.   On approximately 16 different occasions, from in or about December 2013 through in or about May 2014, LEONARD MARCHETTA, the defendant, gave a total of approximately 33 prescriptions to a confidential source working at the direction of law enforcement ("CS-1") in exchange for a total of approximately $17,500 in cash.  Among those prescriptions, MARCHETTA gave CS-1 prescriptions issued in the names of approximately seven different individuals who never saw MARCHETTA.

9.   At all relevant times, WILLIAM TAGLIAFERRO and GREGORY ZACCAGNINO, the defendants, recruited and paid individuals to pose as "patients" in order to receive medically unnecessary prescriptions from LEONARD MARCHETTA, the defendant. TAGLIAFERRO and ZACCAGNINO made appointments directly with the Clinic for the "patients" they sent to see MARCHETTA.  On a number of occasions, TAGLIAFERRO and ZACCAGNINO obtained prescriptions issued by MARCHETTA in the name of the "patient"

4

without the "patient" ever going to the Clinic or consulting
MARCHETTA.

10.  After LEONARD MARCHETTA, the defendant, issued a
medically unnecessary oxycodone prescription in the name of the
"patient," WILLIAM TAGLIAFERRO or GREGORY ZACCAGNINO, the
defendants, took or referred the "patient" to a pharmacy to fill
the oxycodone prescription - that is, to obtain the oxycodone
tablets - of which TAGLIAFERRO or ZACCAGNINO took possession, in
part for distribution.  TAGLIAFERRO and ZACCAGNINO paid the
"patients," typically $150 to $200 in cash, for obtaining and
handing over the oxycodone tablets that they obtained as a
result of their visit to the Clinic.  At times, ZACCAGNINO paid
the "patients," some of whom were addicted to oxycodone, with
oxycodone tablets for their services.

11.  At the direction of WILLIAM TAGLIAFERRO, the
defendant, certain "patients" of LEONARD MARCHETTA, the
defendant, caused Medicaid or private health insurance carriers
to be billed for filling the medically unnecessary oxycodone
prescriptions that MARCHETTA issued.

## STATUTORY ALLEGATIONS

12.  From at least in or about 2012, up to and
including in or about August 2014, in the Southern District of
New York and elsewhere, LEONARD MARCHETTA, WILLIAM TAGLIAFERRO,

and GREGORY ZACCAGNINO, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree, together and with each other, to violate the narcotics laws of the United States.

13.   It was a part and an object of the conspiracy that LEONARD MARCHETTA, WILLIAM TAGLIAFERRO, and GREGORY ZACCAGNINO, the defendants, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

14.   The controlled substance that LEONARD MARCHETTA, WILLIAM TAGLIAFERRO, and GREGORY ZACCAGNINO, the defendants, conspired to distribute and possess with the intent to distribute was mixtures and substances containing a detectable amount of oxycodone, in violation of Title 21, United States Code, Section 841(b)(1)(C).

## OVERT ACTS

15.   In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about April 3, 2012, on Staten Island, New York, WILLIAM TAGLIAFERRO, the defendant, collected an oxycodone

6

prescription written by LEONARD MARCHETTA, the defendant, in the name of a cooperating witness ("CW-1"). The same day, TAGLIAFERRO instructed CW-1 to travel from New York, New York to Staten Island, New York, where TAGLIAFERRO picked up CW-1 and drove CW-1 to a pharmacy. TAGLIAFERRO waited while CW-1 filled the prescription written by MARCHETTA for 150 30-milligram oxycodone tablets. TAGLIAFERRO then collected the oxycodone tablets from CW-1 for distribution.

b.   On or about February 27, 2014, on Staten Island, New York, MARCHETTA issued to CS-1 two separate prescriptions, each of which was for 150 30-milligram oxycodone tablets. MARCHETTA conducted no physical examination before presenting CS-1 with the two oxycodone prescriptions, which were issued in the names of individuals other than CS-1 whom MARCHETTA never saw ("Individual-1" and "Individual-2"). CS-1 paid MARCHETTA $1000 in cash at the Clinic in exchange for the prescriptions.

c.   On or about March 5, 2014, on Staten Island, New York, MARCHETTA issued to CS-1 a prescription for 150 30-milligram oxycodone tablets. MARCHETTA conducted no physical examination before presenting CS-1 with the oxycodone prescription, which was issued in the name of an individual other than CS-1 whom MARCHETTA never saw ("Individual-3"). CS-

1 paid MARCHETTA $1000 in cash at the Clinic in exchange for the prescription.

       d.   On or about March 25, 2014, on Staten Island, New York, MARCHETTA issued CS-1 two separate prescriptions, each of which was for 150 30-milligram oxycodone tablets.  MARCHETTA conducted no physical examination before presenting CS-1 with the oxycodone prescriptions, which were issued in the names of individuals other than CS-1 whom MARCHETTA never saw ("Individual-4" and "Individual-5").  CS-1 paid MARCHETTA $1000 in cash in MARCHETTA's private back office at the Clinic in exchange for the prescriptions.

       e.   On or about June 16, 2014, on Staten Island, New York, TAGLIAFERRO instructed a cooperating witness ("CW-2"), who was working at the direction of law enforcement, to travel from New York, New York to Staten Island, New York, and arranged for CW-2 to see MARCHETTA at the Clinic.  There, MARCHETTA wrote a prescription for oxycodone in the name of CW-2.

       f.   The same day, on or about June 16, 2014, TAGLIAFERRO drove CW-2 to a pharmacy on Staten Island, New York, and TAGLIAFERRO waited while CW-2 filled the prescription written by MARCHETTA for 120 10-milligram oxycodone tablets. TAGLIAFERRO then collected the prescription bottle containing 120 10-milligram oxycodone tablets from CW-2 for distribution

and paid CW-2 $200 in cash.  TAGLIAFERRO was subsequently found to be in possession of the prescription bottle, which was labeled with CW-2's name and contained approximately 120 oxycodone tablets.

g.   On or about August 11, 2014, on Staten Island, New York, GREGORY ZACCAGNINO, the defendant, collected an oxycodone prescription written by MARCHETTA in the name of a cooperating witness who was working at the direction of law enforcement ("CW-3").  The same day, ZACCAGNINO drove CW-3 to a pharmacy on Staten Island, New York, and ZACCAGNINO waited while CW-3 filled the prescription written by MARCHETTA for 90 30-milligram oxycodone tablets.  ZACCAGNINO then collected the oxycodone tablets from CW-3, in part for resale.  ZACCAGNINO paid CW-3 with oxycodone tablets for CS-3's services and was subsequently found to be in possession of the remainder of the 90 oxycodone tablets.

(Title 21, United States Code, Section 846.)

## COUNT TWO

(Conspiracy to Commit Health Care Fraud)

The Grand Jury further charges:

16.   The allegations contained in Paragraphs 1 through 11 are repeated and re-alleged as if fully stated herein.

17.   From at least in or about 2012, up to and including in or about August 2014, in the Southern District of New York and elsewhere, WILLIAM TAGLIAFERRO, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Section 1347.

18.   It was a part and an object of the conspiracy that WILLIAM TAGLIAFERRO, the defendant, and others known and unknown, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## OVERT ACTS

19.   In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.     Overt acts (a), (e), and (f) contained in Paragraph 15 are incorporated by reference as if fully set forth herein.

b.     On or about June 16, 2014, at the direction of WILLIAM TAGLIAFERRO, the defendant, CW-2 traveled from New York, New York to Staten Island, New York, where TAGLIAFERRO arranged for CW-2 to obtain a prescription in the name of CW-2 for 120 10-milligram oxycodone tablets.

c.     The same day, on or about June 16, 2014, TAGLIAFERRO drove CW-2 to a pharmacy on Staten Island, New York. At TAGLIAFERRO's direction, CW-2 caused Medicaid, a healthcare benefit program as defined in Title 18, United States Code, Section 1347, to be billed in order to fill the prescription for 120 10-milligram oxycodone tablets, and CW-2 gave the oxycodone tablets to TAGLIAFERRO.

(Title 18, United States Code, Section 1349.)

## FORFEITURE ALLEGATIONS

20.   As a result of committing the controlled substance offense alleged in Count One of this Indictment, LEONARD MARCHETTA, WILLIAM TAGLIAFERRO, and GREGORY ZACCAGNINO, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting or derived from any proceeds the defendants

obtained directly or indirectly as a result of the offense and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offense alleged in Count One of this Indictment.

21.   As a result of committing the health care fraud offense alleged in Count Two of this Indictment, WILLIAM TAGLIAFERRO, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461 all property, real and personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offense alleged in Count Two of this Indictment.

<u>SUBSTITUTE ASSETS PROVISION</u>

22.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants,

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value;

or

        e.     has been commingled with other property

which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18,

United States Code, Section 982(b) and Title 21, United States

Code, Section 853(p),  to seek forfeiture of any other property

of the defendants up to the value of the above forfeitable

property.

     (Title 18, United States Code, Sections 853, 981, and 982;
         Title 21, United States Code, Section 853; and
          Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
United States Attorney

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

LEONARD MARCHETTA,
WILLIAM TAGLIAFERRO, and
GREGORY ZACCAGNINO,

Defendants.

## SEALED INDICTMENT

14 Cr.

(21 U.S.C. § 846; 18 U.S.C. § 1349.)

PREET BHARARA
United States Attorney.

A TRUE BILL

*[signature]*

Foreperson.

9-2-14- TRUE BILL, SEALED INDICTMENT &
ARREST WARRANT

JUDGE RONALD L ELLIS (MAG)

*[signature]* 9-2-14